### Application of WARD.
#### Patent Appeal No. 5040.

Court of Customs and Patent Appeals.
July 3, 1945.

James P. Burns, of Washington, D. C., and Hugo A. Kemman, of Philadelphia, Pa., for appellant.

W. W. Cochran, of Washington, D. C. (E. L. Reynolds, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the examiner finally rejecting two claims, numbered 18 and 19, of appellant's application, serial No. 342,910, for patent captioned "for Recovery of Valuable Hydrocarbons," filed June 28, 1940. Several claims stand allowed.

Those on appeal were rejected as being unpatentable over the claims of a patent No. 2,211,038, issued to appellant August 13, 1940, upon an application, serial No. 170,-508, filed October 22, 1937, no other ref-erence being cited. The application under consideration does not purport to be other than an original application.

Before considering the claims on their merits it is proper to state, or restate, a rule of law.

By reference to the filing dates of the respective applications as above given, it will be observed that the respective applications were copending during the period from June 28, 1940 to August 13, 1940, upon which latter date the patent issued.

Under the circumstances it is conceded that appellant's patent does not constitute prior art against him, but it was cited under the rule as stated by the examiner:

"It is well settled law that an applicant cannot obtain a second patent unless what is set forth in the claims involves invention over what has already been patented to him. Ex parte Chapman, 329 O.G. 263; 1924 C.D. 143."

Neither the examiner nor the board used the expression "double patenting" in their decisions, but it is obvious that, unless the claims at issue are for a *different invention* from the claims of the patent, their grant would result in double patenting and extend appellant's monopoly.

In his brief before us appellant states, *inter alia:*

"The law is clear that an applicant's copending earlier patent is not a part of the prior art insofar as *its disclosure* is concerned. An epitomized statement of this accepted doctrine appears in the decision of Judge Learned Hand in Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 22 F.2d 259, 260, wherein it was held:

" 'Calkins' earlier patent *was not part of the prior art, and it is not necessary to the validity of the claims in suit that they should embody a patentable advance over the earlier disclosure. The two applications were co-pending,* and it is a matter of indifference which of the patents issued first, provided that the claims are for separate inventions.' "

The italics in the foregoing are those used in appellant's brief. It is noted that the concluding clause reading, "provided that the claims are for separate inventions," is not italicized in the brief.

In that case the *validity* of one of two patents issued to the same patentee upon

copending applications was called in question. The court found that the patents were for separate inventions; hence, its ruling on the matter of "double patenting."

The ruling has no application in this proceeding, unless it be held that the appealed claims cover an invention different from that defined in the patent claims.

In the instant case the brief of the Solicitor for the Patent Office correctly asserts (see In re Christmann et al., 128 F.2d 596, 29 C.C.P.A., Patents, 1037, and cases therein cited):

"It is axiomatic, however, that if two patents are to be granted there must be two inventions present and the issue is, therefore, whether the present claims recite a process which involved an invention over that set forth in the claims of the patent."

The claims of the patent particularly referred to in the examiner's decision as being drawn to the same inventive concept as the present appealed claims are Nos. 3 and 6. Appealed claim 18 is illustrative, and for convenience in comparison we here quote it and patent claims 3 and 6 in parallel columns:

It will be observed that the introductory clause of the appealed claims recites that it is a process for separating three hydrocarbon ingredients of a mixture for each other, while the introductory clauses of the patent claims are for separating one ingredient from a mixture of ingredients. Also, it will be observed that in appealed claim 18 and patent claim 3 the three ingredients named are isoprene, cyclopentadiene, and piperylene, and that in both instances the cyclopentadiene is so treated that it is converted to dicyclopentadiene.

The following clear exposition of the processes involved is quoted from the statement of the examiner following the appeal to the board:

"Applicant's alleged invention relates to a process for separating from each other isoprene, cyclopentadiene and piperylene contained in a mixture of these compounds. The boiling points of isoprene, cyclopentadiene and piperylene are 34°C., 40°C. and 43°C., respectively. In view of the small differences of boiling points involved, a separation of these three substances from one another by fractional distillation becomes difficult.

"18. A process for separating from each other the three relatively highly heat sensitive conjugated diene hydrocarbons of closely similar and successively increasing boiling points isoprene, cyclopentadiene and piperylene contained in a mixture of said compounds, which comprises selectively dimerizing to dicyclopentadiene the cyclopentadiene component of said mixture, said selective dimerization of said cyclopentadiene being sufficient to reduce the quantity of said intermediately boiling diene in said mixture to a proportion negligible for the separation of said isoprene and piperylene of said mixture from each other by distillation, and separating said isoprene and piperylene from said dicyclopentadiene and from each other by distillation."

"3. In a process for selectively separating cyclopentadiene from a mixture containing other unsaturated substances of similar boiling point including isoprene and piperylene, the step of subjecting said mixture in liquid phase to superatmospheric pressure and to temperature conditions in the neighborhood of 100° C. to selectively dimerize cyclopentadiene to dicyclopentadiene, said superatmospheric pressure being sufficient to maintain said liquid phase.

"6. In a process for selectively separating cyclopentadiene from a mixture containing other heat polymerizable diene material of similar boiling point wherein said cyclopentadiene is selectively converted to dicyclopentadiene, wherein said dicyclopentadiene is separated from unpolymerized material, and wherein said separated dicyclopentadiene is depolymerized to cyclopentadiene, the step of subjecting said mixture to superatmospheric pressure and to temperature conditions substantially above 40°C. but substantially below 170°C. to selectively convert cyclopentadiene to dicyclopentadiene, said superatmospheric pressure being sufficient to maintain at least the larger part of said mixture in the liquid phase."

"In order to effect a separation of these three components according to applicant's process, the mixture thereof is subjected to a treatment which effects a selective dimerization of the cyclopentadiene into dicyclopentadiene. The isoprene and piperylene remain unchanged. The resulting mixture is then fractionally distilled in order to effect a separation of isoprene, piperylene and dicyclopentadiene from one another. Since the intermediate boiling cyclopentadiene of the original mixture has been converted to dicyclopentadiene with a boiling point of about 172°C., the separation of isoprene from piperylene by fractional distillation is facilitated.

"The step of selectively dimerizing cyclopentadiene in the presence of isoprene and piperylene is carried out by heating a mixture of these three compounds at a temperature in the range of 40 to 170°C. and under a superatmospheric pressure sufficient to maintain the mixture at least partially in the liquid phase.

\* \* \* \* \* \*

"Claims 18 and 19 are rejected as unpatentable over the claims of applicant's prior patent Ser. No. 2,211,038. The claims of the patent are directed to a process for selectively dimerizing cyclopentadiene admixed with other heat-polymerizable, diolefine hydrocarbons such as isoprene and piperylene. Thus, for example, claim 3 of the patent calls for treating a mixture containing isoprene, cyclopentadiene and piperylene at a temperature in the range of 40 to 170°C. and at a pressure sufficient to maintain the mixture in the liquid phase. Claim 6 of the patent is similar to claim 3 but differs therefrom in that the diene material admixed with the cyclopentadiene is characterized as having a similar boiling point and as being heat polymerizable. It also recites the steps of separating the dicyclopentadiene from the unpolymerized material and depolymerizing the dicyclopentadiene so separated to cyclopentadiene."

It here may be remarked that the temperature range of 40°C. to 170°C., stated by the examiner to be called for by claim 3 of the patent, in fact appears in claim 6, as will be seen by reference to the claims, supra.

After the above comparison the examiner continued:

"It is apparent from a comparison of claims 18 and 19 of the instant application with claim 3 of the patent that the former differ from the latter in that they recite the added step of separating the mixture obtained from the selective dimerization step into isoprene, piperylene, and dicyclopentadiene by distillation. It is the opinion of the examiner, however, that this latter step adds nothing of patentable merit to the claim of the patent. It is, of course, conventional to separate various liquid mixtures into their individual components by fractional distillation, and the principles upon which such separations are based are well known to the skilled chemist. It would be apparent to the skilled chemist, therefore, that a separation of the mixture obtained as a result of the process set forth in the claims of the patent could be effected by fractional distillation, if so desired. Hence, no invention would be involved in separating into its individual components by means of fractional distillation the mixture obtained as a result of the process claimed in the patent.

\* \* \* \* \* \*

"It is to be noted from the disclosure or the patent that the mixture of isoprene, piperylene and dicyclopentadiene obtained as a result of the selective dimerization step has no utility per se and that it must be processed further, as by fractional distillation, to separate therefrom dicyclopentadient which may in turn be depolymerized to cyclopentadiene \* \* \*. Furthermore, the patent states that the step of selectively dimerizing cyclopentadiene in the presence of isoprene and piperylene is of utility in a process for the recovery of these latter compounds when admixed with cyclopentadiene."

In the brief on behalf of appellant the errors alleged in his reasons of appeal are epitomized as follows:

"\* \* \* Succinctly, the Examiner and the Board of Appeals erred:

"(a) In their construction of the claims of appellant's patent No. 2,211,038;

"(b) In their construction of appealed claims 18 and 19; and

"(c) In their reliance *upon the disclosure* of appellant's patent No. 2,211,038 to supplement the rejection purportedly bottomed upon the claims of that patent." (Italics quoted)

We assume that had the claims here involved been presented in appellant's application upon which his patent was based they would have been allowed as expressing in different phraseology the inventive concept common to claims 3 and 6 of the patent.

We are unable to understand why appellant did not then present them but chose to wait until about six weeks before accepting the patent and then present them in an application original on its face.

■ Referring to the specific allegations of error quoted above as being epitomized in appellant's brief, we fail to find wherein the tribunals of the Patent Office made an erroneous construction of the claims of appellant's patent or of the claims on appeal, nor do we find any error in their reliance upon the disclosure of the patent for the purposes stated by them.

In the argumentative part of the brief on behalf of appellant it is said:

"That appellant has contributed a series of meritorious patentable contributions to the art is undenied. One of those contributions is represented by appellant's patent No. 2,211,038 * * *, and another by allowed claims 7, 11, 15, 16 and 20 * * * of the application here on appeal."

The contention so made is doubtless true, and for such contribution to the art he has received one patent and later, upon the record as it now stands, will receive another. Under the law governing the grant of patents, however, he is not entitled to include in the second patent claims which would extend the monopoly incident to the first patent beyond the period fixed by that law.

It seems clear to us that the grant of the appealed claims would so extend his monopoly and that, therefore, they were properly rejected.

The decision of the board is affirmed.

Affirmed.